UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2003 NOV 13  P 1: 06

-----------------------------------X

MICHELLE PIEGER, AS ADMINISTRATRIX
FOR THE ESTATE OF JEFFREY MICHAEL PIEGER,

CIVIL ACTION

NO. 3:02CV00749(SRU)

Plaintiff

VS.

METRO-NORTH RAILROAD COMPANY,

Defendant

NOVEMBER 12, 2003

-----------------------------------X

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL INSPECTION AND FILMING

In 1997, Metro-North foreman Herbert Renert suffered the amputation of both his legs due to Metro-North's use of a rope and hook to move cars in and out of shops. In response to the Renert injury, a Metro-North Committee was formed to evaluate all car movements in Metro-North's shops. The Renert Committee concluded it was concerned about the difficulty of employees making a positive stop of train movement while using the capstan and rope system at the New Haven Wheel True Mill. As a result of the Renert Committee's recommendation (and years before the date of Jeff Pieger's death), Metro-North bought a Shuttle Wagon to move cars in and out of the New Haven Wheel Mill precisely in order to ensure a positive stop and avoid a train rolling as it did when it crushed the decedent Jeff Pieger. Use of a Shuttle Wagon

avoids the need for an employee to place a small wood chock with his hand under the wheel of a moving train in order to stop the train and prevent any further movement of the train.

However, on March 5, 2002, Metro-North negligently failed to use that Shuttle Wagon, resulting in Jeff's death. It was only because Metro-North negligently failed to use the Shuttle Wagon that the train was allowed to roll without the ability to make a positive stop. But for Metro-North's failure to use the Shuttle Wagon, Jeffrey Pieger still would be alive today. An inspection of the Shuttle Wagon moving cars in and out of the Wheel Shop (which completely avoids the use of the capstan and rope) is central to the issue of negligence in this FELA case.

Metro-North is liable under the FELA for using "a procedure or method which it knew or in the exercise of reasonable care should have known, would result in injuries." L. Sand, Modern Federal Jury Instructions (Civil), Instruction 89-18 (2003). Here, Metro-North established its own standard of care for moving cars in and out of the Wheel Shop, namely by using the Shuttle Wagon. This is not a case where the plaintiff is claiming Metro-North should have used "the latest, best or most perfect" tool because it was Metro-North's own failure to live up to its own standard of care that caused Pieger's death. See App. A (Portion of 3/24/98 Metro-North Locomotive Movement Evaluation). Pieger's widow is entitled to videotape how the Shuttle Wagon moves cars in and out the Wheel Shop because it goes to the heart of her claim of negligence against Metro-North.

Every work day the Shuttle Wagon moves cars in and out of the Wheel Shop in New Haven. Merely standing to one side and videotaping the Shuttle Wagon doing that is not unduly burdensome. Nor will such a duly noticed videotape inspection result in an "informal roving deposition."

Metro-North argues that the plaintiff has conducted an inspection of the Wheel Mill Shop and should not be allowed another. However, all counsel and claim agents at the initial inspection understood plaintiff merely was conducting an informal walk through of the Shop without any photographing. See App. B (April 9, 2002 letter arranging informal visit to Shop). It was further understood the plaintiff would notice a formal inspection in order to photograph and videotape the Wheel Mill Shop operations. The plaintiff duly noticed that formal photographic inspection and Metro-North has no basis to limit plaintiff's photography of the Shop's operations.

FOR THE PLAINTIFF,

BY _____
George J. Cahill, Jr. (ct 4485)
CAHILL & GOETSCH, P.C.
43 Trumbull Street
New Haven, Connecticut 06511
(203) 777-1000

3

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed, postage prepaid, on this 12th, day of November, 2003, to:

William W. Cobb Esq.
Landman Corsi Ballaine & Ford
120 Broadway – 27th Floor
New York, New York 10271

_____

# Appendix A

# MECHANICAL DEPARTMENT SHOP FACILITIES

# CAR AND LOCOMOTIVE MOVEMENT EVALUATION

## DATED: MARCH 24, 1998

## FINAL

**COMMITTEE MEMBERS:**

Ken Barnish, Sr. Mechanical Engineer - M of E
Lova Borisjek, Sr. Equipment Engineer - Track and Structures
Al Cecere, Facility Director - M of E
Jim Griffin, Asst. Superintendent - Safety
Joe Kanell, Asst. Superintendent - Transportation
Mary Walsh, Litigation Agent - Claims Management and Loss Control

Exhibit 42

**INTRODUCTION**

This report summarizes the findings and recommendations of the Committee appointed to evaluate the movement practices of the five (5) major repair shops of the Mechanical Department.

**BACKGROUND**

The Committee was appointed and convened on December 30, 1997 as requested by Chief Mechanical Officer G. R. Butt as a result of a car movement accident at the Stamford Repair Facility.

The Committee was tasked with evaluating shop movement practices at the Brewster, Harmon, New Haven, North White Plains and Stamford Facilities to identify apparent safety risks and to recommend safety improvements to minimize these risks.

SUMMARY OF MOVEMENT METHODS

1. Movement of equipment by use of fork trucks (tow motors) either with pull chain or by pushing with forks is a method in use at a few facilities. This method does not provide adequate safety measures as compared to movement using crews and operable tow cars or locomotives.

2. Bugging practices at facilities currently using this method appear to be an acceptable means with proper procedures.

   Bug systems at New Haven and Stamford are inadequate to handle a triplet configuration and are physically unmanageable to be considered safe options for equipment movement.

3. Train-crew use appears to provide a high level of safety although with negative cost and efficiency aspects when considered as the primary movement method.

4. The use of strategically located car pullers (a/k/a capstans) provide what appears to be a simple, safe means to propel a carset but does not offer a controlled means to ensure a positive stop of the rolling cars.

5. On-rail car movers (a/k/a trackmobile) provide a level of safety matching that of the use of switching crews and

provides a means to thoroughly control the motion of carsets. This method also allows shop forces to initiate car movements as efficiently and without delay, comparable to previous methods.

## RECOMMENDATIONS

Attached, as part of the Appendix, are the specific findings and recommendations for each shop. The following summarizes these reports.

## GENERAL:

1. Discontinue moving any equipment with the use of a fork truck. The committee advocates the use of a trackmobile for movement of cars into and out of those particular shops noted in the report. This appears to be a safe, workable method, capable of moving cars and then making a positive stop of the movement.

2. Each shop should create written movement procedures specific to the types of moves, site locations of moves and equipment condition variations made at the facility. These procedures should be authored by those individuals responsible for performing equipment moves and reviewed by shop safety committees and management.

4

Procedures should include manning requirements, manning positions, communication means and methods, equipment setup requirements for various equipment types and operational conditions, track location condition awareness, blue light/derail/move annunciator handling in addition to other aspects.

Documented procedures and workforce acknowledgement of the existence of such procedures provides a solid basis for a structured means to convey an awareness of safety critical functions.

3. Provide training for qualification by candidates responsible for the equipment movement methods in use or to be adopted using the procedures developed.

**NEW HAVEN AND STAMFORD:**

Consider the lease or purchase of an on-rail car mover for each location, sized and equipped to satisfy the needs of the specific facility. Recommend that a joint committee comprised of shop management, safety department, equipment engineering and craft personnel be established to define specific size and configuration needs of the car mover and to outline shop facility upgrades needed to permit the use of the car movers.

It may be advantageous to rent or lease a car mover to provide this operational and safety benefit immediately. This will allow

5

shop familiarization with this type of vehicle and help define the accessories needed for the permanent model(s) to optimize safety and efficiency.

**BREWSTER:**

Consider the use of crews or an on-track car mover for movements out of the shop from the lift track rather than fork truck use. At this time, the lift track generally sees limited movement action and can be effectively switched out using yard crews. Future expanded use of the lift track or lack of operable carsets or locomotive to perform movements may require alternative methods such as a car mover.

**HARMON:**

No alternative means or methods for car and locomotive movements are recommended. Current practices appear acceptable.

**NORTH WHITE PLAINS:**

No alternative means or methods for car shop movements are recommended. For the Paint and Freight Shops, however, it is recommended that the limited number of movements made by fork trucks be substituted by more thorough scheduling of moves with yard crews.

6

# APPENDIX

A. **SHOP FINDINGS AND RECOMMENDATIONS**

    I. New Haven and Stamford

    II. Brewster

    III. Harmon

    IV. North White Plains

B. **COMMITTEE MEETING MINUTES**

    V. Meetings held on 12/30/97, 1/14/98, 2/3/98 and 2/10/98

C. **OTHER DOCUMENTS**

    VI. Harmon - M. Taylor Recommendation

    VII. North White Plains - Procedure for Energizing/De-energizing Cars

APPENDIX I

## NEW HAVEN AND STAMFORD SHOPS

### EQUIPMENT SWITCHING AND MOVEMENT FINDINGS

**FINDINGS**

1. Tow motors still being used at New Haven Wheel Mill to spot one set of wheels.

2. Tow motors with and without cables being used in M2 Shop.

3. Winch at west end of Wheel Mill out of service (required three (3) metal cables when in use).

4. Capstan in service east end of Wheel Mill slow. It uses heavy weight rope, no moving parts to get fingers caught in. Hook must be manually placed on train and manually removed. Speed is approximately 20 feet per minute.

    Difficulty in stopping train once train is rolling. Truck must be cut back-in while train is moving in order to stop or throw chock under train while train is moving. This is not the optimum way to handle. Employee on handbrake is an option.

5. Winch is alarmed as lights and buzzer activate. Capstan is not connected to an alarm.

6. Capstan movement cannot be stopped at definite point.

7. No written or standardized procedures in effect for movement of cars into or out of shop. No training given to employees

8

except by other employees.

8. Moves are made with and without air.

9. Each trick has differing techniques in movement depending upon supervisor/personnel.

10. It appeared each crew was its own island, i.e. M.I. Track did things one way, Wheel Mill the other, etc. Different techniques on moving cars.

11. Spoke with Mr. Renbarger and Mr. Dorsi at end of tour. They wanted capstans exclusively.

**OPTIONS AVAILABLE TO MOVE CARS INCLUDE:**

1. Train Crew - Engines
2. Winch
3. Capstan
4. Forklift/Tow Motor
5. Trackmobile
6. Bug System
7. Creeper

**PROS AND CONS:**

1. **TRAIN CREWS** - Engines to make all moves are prohibitively expensive. Amount of shop moves needed relative to adding an entire extra shop switching crew out of proportion.

2. **WINCH** - Presently out of service but is presently installed at west end of Wheel Mill and is out of service long term. Winch requires two (2) to three (3) heavy steel cables that must be

9

applied with a hook to the wishbone of train. Steel cable strung across floor can tangle, whip, etc. Once again, making a **positive stop** to a train is a problem.

3. **CAPSTAN** - Slow speed, approximately 20 feet per minute. One heavy rope is attached to capstan and the other end with a hook to the wishbone. No moving parts to get fingers caught in. Once again, challenge is in stopping train once movement has begun. Presently in various parts of shop, various techniques were used. Cutting truck back in while train is rolling, throwing a chock under the wheels. Usually train has insufficient air to dump from cab, possibly an employee on the handbrake, a skate or even a retarder is an option to make a positive stop.

4. **FORKLIFT/TOW MOTOR** - Due to prior difficulties, physical layouts and physical restrictions in shops, necessity to handle moving equipment. This option is not a viable one for the future.

5. **TRACKMOBILE** - Possibilities being investigated. This option is a good option. Car can tie on, it has air and can stop equipment. Problems include size of trackmobile, getting on and off rail, who will operate it and impact on labor agreements. While it may be good at Stamford Shop where the rail deadends, would it be appropriate at New Haven MU Shop where there are through tracks? Would there be an emission problem inside?

6. **BUG SYSTEM** - No enthusiasm for this idea. Not presently used;

10

rectifiers are unable to handle system. Can be hazardous when making "connections", movement, etc.

7. **CREEPER** - Universally disliked by Mechanical forces as it is awkward and can cause injuries.

## RECOMMENDATIONS

**Capstans** are a relatively low cost solution. Low speed, partial control and keeping employees away from equipment are a plus. Lack of ability to positively stop the train is a concern and must be addressed. Allowing equipment to roll and stop on a grade, throwing a chock or cutting a truck back in while the train is moving is not the optimum procedure. **Trackmobiles** are an option. Expense must still be explored, impact on labor agreements is a concern, getting trackmobile on and off the rail may be a problem. However, trackmobiles are equipped with air and can positively spot and stop equipment. A combination of these two options may be appropriate at New Haven.

As information, most supervisors at New Haven wanted capstans. (The Committee's concern in respect to that is the lack of ability to ensure a positive stop of the train.)

In addition, Stamford Shop was investigated. Stamford Shop, unlike New Haven MU Shop, has two deadend tracks. The major concern is either pulling cars in or shoving them out under the wire. Consensus was that a trackmobile placed at the extreme east end of the two (2) interior tracks would serve the facility. The trackmobile, operated by a mechanical employee, could get off one

track and wheel to the other track for service (across the shop floor).

Shop people were not convinced capstans would be appropriate for Stamford. They were especially concerned about stopping equipment coming into the shop with a capstan (even at the slow speed). If a train got away, there would be no place to run except the shop wall.

As information, at Stamford, Superintendent J. Hogan and General Foreman J. Kulka wanted trackmobiles. (In fact, there is a fundamental disagreement between shops on techniques in movement of cars into and out of mechanical facilities.)

# Appendix B

## CAHILL & GOETSCH, P.C.
ATTORNEYS AT LAW

GEORGE J. CAHILL, JR.

43 TRUMBULL STREET
NEW HAVEN, CONNECTICUT 06511

(203) 777-1000
Fax: (203) 865-5904

April 9, 2002

Via Facsimile

Mary Walsh, Claims Manager
Metro-North Railroad Company
Safety & Claims Services Dept.
50 Union Ave. – 4th Floor West
New Haven, CT 06519

Re:   Jeffrey Pieger v. Metro-North Railroad Company

Dear Mary:

    Please provide us with a copy of the FRA 10 Item Report to allow us to understand the facts surrounding the fatality and to be better able to explain to Mrs. Pieger how her husband was killed.

    Also, we would like to informally inspect the Wheel Mill without taking any pictures or measurements. We request permission for Charlie, Scott, and myself to simply walk through the Wheel Mill at a convenient time.

    Thank you for your anticipated cooperation

Very truly yours,

George J. Cahill, Jr.

GJC/mrs

```
*********************
***  TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO                    2889
CONNECTION TEL              7862950
SUB-ADDRESS
CONNECTION ID               NH RISK MGMT
ST. TIME                    04/09 10:58
USAGE T                     00'40
PGS.                        2
RESULT                      OK
```

# CAHILL & GOETSCH, P.C.
### Attorneys At Law

George J. Cahill, Jr.
Charles C. Goetsch
Scott E. Perry

43 Trumbull St.
New Haven, CT 06511

Phone: 203-777-1000
Fax: 203-865-5904

## FAX COVER MEMO

TO: Mary Walsh

FAX NUMBER: 786-2950

FROM: George Cahill, Jr.

TELEPHONE: 203-777-1000

DATE: 4/9/02

RE: Tiger, Jeffrey

_____1_____ Pages to Follow

MESSAGE: