FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

[2003] A 8: 22

--------------------------------------------------------------X

Michelle Pieger, Administratrix for the
Estate of Jeffrey Michael Pieger

                    Plaintiff,

vs.

Metro-North Railroad Company,

                    Defendant.

**DECLARATION OF
WILLIAM W. COBB**

Civil Action
No.: 3:02CV00749 (SRU)

November 26, 2003

--------------------------------------------------------------X

**I, WILLIAM W. COBB**, being of full age, hereby declare under the penalties of perjury:

1.      I am an attorney admitted to practice in the United States District Court of Connecticut and an associate of the law firm of Landman Corsi Ballaine & Ford P.C., attorneys for defendant in the above-captioned action. As such, I am fully familiar with the facts and circumstances hereinafter contained, the source of my knowledge being the file maintained by my office in the course of handling this action.

2.      I submit this Declaration in reply to plaintiff's opposition and in support of defendant's motion for a protective order. The arguments made in reply are in addition to the arguments that defendant previously made in bringing the motion for a protective order.

3.      As is more fully set forth in the defendant's memorandum of law, defendant's main points in objecting to plaintiff's demands are as follows:

358336.1 DocsNY

4.      First, defendant objects to plaintiff's demand for a deposition of a Metro-North employee responsible for the replacement or repair of the damaged tire on the shuttle wagon. Defendant objects to the information sought, since the information concerning the shuttle wagon is not reasonably calculated to lead to the discovery of admissible evidence.

5.      Second, the deposition of Mr. Butt is intended to harass and seeks irrelevant information. The information plaintiff seeks - i.e. information concerning a report that Mr. Butt helped draft regarding the movement of cars in 1998 - is available to plaintiff and the plaintiff in fact has a copy of the 1998 report. Forcing Mr. Butt to discuss the information that is already included in the report at a deposition is cumulative and intended to harass. Moreover, defendant objects to the information sought, since, again, this information cannot reasonably be calculated to lead to the discovery of admissible evidence. The shuttle wagon had never become a regular method for car movement in the New Haven Wheel Mill (See deposition transcript of John Hogan (pp. 17-18), a true and correct copy of which is annexed hereto at **Exhibit "A"**), and therefore the use of the shuttle wagon following the accident involving Mr. Pieger was a subsequent remedial measure to the use of the capstan and rope.

6.      Third, defendant objects to plaintiff's interrogatories insofar as each interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. The first interrogatory seeks information related to the shuttle wagon, which, as earlier argued, is irrelevant. The second interrogatory seeks information concerning the windscreen surrounding the pit in the wheel mill, and is irrelevant since it seeks information related to subsequent remedial measures. The third and final interrogatory seeks information related to subsequent remedial measures concerning the button on the control panel.

7.    For these reasons, defendant seeks a protective order.  The instant motion is made in good faith.


I HEREBY DECLARE, under the penalties of perjury, pursuant to U.S.C. § 1746 that the foregoing is true and correct.


Dated: New York, New York
       November 26, 2003

_William W. Cobb (Ct 24870)_


To:    Cahill & Goetsch, P.C.
       43 Trumbull Street
       New Haven, CT 06511


358336.1 DocsNY

1.

1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF CONNECTICUT

3       ------------------------------x

4       MICHELLE PIEGER, AS,                :
        ADMINISTRATRIX FOR THE ESTATE:
5       OF JEFFREY MICHAEL PIEGER,         :

6               Plaintiff,        : Civil Action

7           -versus-             : 3:02CV00749(SRU)
        METRO-NORTH RAILROAD          :
8       COMPANY,                  :

9               Defendant.        :

10      ------------------------------x

11

12

13

14              Deposition of JOHN HOGAN, taken

15      pursuant to the Federal Rules of Civil Procedure,

16      at the law offices of CAHIL & GOETSCH, P.C., 43

17      Trumbull Street, New Haven, Connecticut, before

18      Lynn Muscatello, a Notary Public in and for the

19      State of Connecticut, on August 5, 2003, at

20      9:55 a.m.

21

22

23

24

25              SANDERS, GALE & RUSSELL, INC.
                        P.O. BOX 1048
                     NEW HAVEN, CT 06504
                203-824-4157        1-800-824-4541

1    A P P E A R A N C E S:

2

3            For the Plaintiff:

4            Cahill & Goetsch, P.C.
             43 Trumbull Street
5            New Haven, Connecticut   06511

6            By:   GEORGE CAHILL, ESQ., of Counsel

7            For the Defendant:

8            Landman, Corsi, Ballaine & Ford, P.C.
             120 Broadway, 27th Floor
9            New York, New York   10271-0079

10           By:   WILLIAM COBB, ESQ., of Counsel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          S T I P U L A T I O N S

2

3                    IT IS HEREBY STIPULATED AND

4     AGREED by and between counsel for the

5     respective parties hereto that all

6     technicalities as to proof of the official

7     character before whom the deposition is to be

8     taken are waived.

9

10                    IT IS FURTHER STIPULATED AND

11    AGREED by and between counsel for the

12    respective parties hereto that the reading

13    and signing of the deposition by the deponent

14    are waived.

15

16                    IT IS FURTHER STIPULATED AND

17    AGREED by and between counsel for the

18    respective parties hereto that all

19    objections, except as to form, are reserved

20    to the time of trial.

21

22

23

24

25                    *  *  *  *  *  *

1    J O H N    H O G A N, of Metro-North Railroad, 2

2    Brewery Street, New Haven, Connecticut  06511,

3        called as a witness, having been first duly

4        sworn by Lynn Muscatello, a Notary Public in

5        and for the State of Connecticut, was

6        examined and testified as follows:

7    DIRECT EXAMINATION

8    BY MR. CAHILL:

9        Q.  Mr. Hogan, what is your present position

10   with Metro-North?

11       A.  My present position with Metro-North is

12   facilities director on the New Haven line.

13       Q.  What are your basic duties and

14   responsibilities as facilities director?

15       A.  My basic responsibilities is to oversee

16   the operations for the mechanical department, of

17   the mechanical department operations on the New

18   Haven line, which include New Haven shop and yard,

19   Stamford shop and yard, Bridgeport yard.

20       Q.  And for how long have you been the

21   facilities director on the New Haven line?

22       A.  Approximately three years.

23       Q.  And back in March of 2002 did someone

24   notify you there was an injury sustained by Jeff

25   Pieger?

1      A.  Yes.

2      Q.  Who was that?

3      A.  I believe it was General Foreman Mike

4  Gagliardi.

5      Q.  What, if anything, did Mr. Gagliardi tell

6  you?

7      A.  He called me to notify me there was an

8  injury down at the wheel true mill with Mr. Pieger

9  and that emergency services were en route.

10      Q.  Okay.  And what, if anything, did you do?

11      A.  I immediately came to the wheel shop

12  where Mr. Pieger was injured and surveyed the

13  scene quickly and then went on to the hospital to

14  check on Mr. Pieger.

15      Q.  All right.  And when you arrived at the

16  hospital did you see Mr. Pieger?

17      A.  No, I did not.

18      Q.  And after leaving the hospital where did

19  you go?

20      A.  I went back to the shop.  I went back to

21  my office as a matter of fact.  And other people

22  were en route coming down to assist.  By that time

23  I already found out about Mr. Pieger passing away.

24      Q.  All right.  So what, if anything, did you

25  do as far as the investigation is concerned of

1   Mr. Pieger's fatality?

2       A.   I was pretty much isolated from the

3   investigation.  The whole situation was pretty

4   disturbing for me.  He'd been the first employee

5   I'd lost.  And being at the hospital and being

6   told by the doctor Mr. Pieger passed away was kind

7   of tough.  I did reach out to a couple people in

8   the safety department, Annie, Ann Kirsh at the

9   time because she was en route.  And she came down

10  to give some moral support while things started to

11  happen.

12      Q.   What is your understanding as far as what

13  happened to Mr. Pieger?  At the time he was being

14  crushed, what was he doing?

15      A.   It's my understanding they were in the

16  process of spotting a wheel on a train for a set

17  of cars for a wheel true.  They completed one

18  wheel and were in the process of repositioning in

19  another wheel that was on their work scope at the

20  time.

21      Q.   What happened at the time they were

22  repositioning the second wheel?

23      A.   It's my understanding in the process of

24  repositioning it, Mr. Pieger reached over the

25  machine to set the idler rollers against the

7

1    wheels.  And at that time the car rolled into him

2    and pinned him against the wheel true machine.

3        Q.  Now, subsequent to the injuries sustained

4    by Herb Rennard (phonetically) back in December of

5    1997, there was a committee that was formed to

6    investigate car movements in the various shops on

7    the railroad; is that correct?

8        A.  I understand there was, yes.

9        Q.  And you were involved in that committee,

10   were you not?

11       A.  I was not.

12       Q.  You received a copy of the committee

13   report; is that true?

14       A.  I had seen a copy of it.

15       Q.  You made recommendations to the

16   committee; isn't that correct?

17       A.  I don't recall.  I'd have to review the

18   report.

19       Q.  What type of training does a machinist

20   have in the wheel true mill as far as movement of

21   cars?  What type of formal training does he have

22   back prior to the fatality on March 5, 2002?

23       A.  All the training historically as long as

24   I've been around New Haven has always been done

25   from fellow employees.  The employees are working

1  the wheel trues, taking ownership of the wheel

2  true.  They instruct each other in the appropriate

3  way and occasionally are reviewed by some general

4  foremen and foremen.

5      Q.  Aren't the procedures and methods used on

6  the different shifts different depending on who

7  the crews are?

8      A.  I don't know.  I mean, I would think they

9  would be pretty much the same.

10      Q.  When a car is set in movement by capstan,

11  how is it brought to a stop?

12      A.  Generally, they will bring it down

13  slowly.  And there was wooden chocks for the wheel

14  on the wheel true machine.  They had, they have

15  wooden chocks in place.

16      Q.  Is there any other method besides chocks?

17      A.  No.

18      Q.  Have they ever used air at all as far as

19  cutting a truck in?

20      A.  No.  Oh, I'm sorry.  If there was air on

21  the car, that's one way to stop it, also.

22      Q.  Is it also possible to use a hand brake

23  to stop the cars?

24      A.  It would depend on what type of equipment

25  it is.

1      Q.   When applying a chock on a rail, how is

2  that done?

3      A.   Place the chocks somewhere in close

4  proximity to where they want the wheel to stop.

5  And they will lay it on the rail.  And then when

6  the wheel approaches, it comes in contact with the

7  chock.

8      Q.   So if you're going to stop, in this case

9  the number three wheel on the 8821 car that was

10  involved in the accident, when would you place the

11  chock on the rail?

12      A.   I've never worked the machine.

13  Personally, I would probably place it on the rail

14  ahead of wheel number four, as wheel number three

15  approaches the machine.

16      Q.   When you say ahead of wheel number four,

17  what are you referring to?  I realize wheel four

18  would be before wheel three, but if you place the

19  chock on the rail before wheel four, doesn't wheel

20  four have to clear the machine first?

21      A.   Well, depends on where they chock it.

22  I've seen them chock it outside the area of the

23  machine.

24      Q.   And they will place it to get number

25  three where it lands on the machine by chocking a

1    different wheel?

2        A.   Yes.

3        Q.   All right.  Isn't it true that after the

4    committee investigated the Rennard injury it was

5    recommended each shop should rewrite written

6    movement procedures specific to the types of

7    movement at that facility?

8        A.   Yes.

9        Q.   Was that done at the wheel true mill

10   prior to March 5, 2002?

11       A.   I don't believe so.  I believe the first

12   reports or instructions ever done were done in

13   Stamford.  I'm not sure if it ever flowed over to

14   the New Haven shop.

15       Q.   Today, in August of 2003, do people in

16   the wheel true mill have a written standardized

17   procedure in moving equipment?

18       A.   It's written instruction with the shuttle

19   wagon training.  It should be part of that pack.

20       Q.   It tells them how to move and position

21   the equipment today?

22       A.   Yes.

23       Q.   And that's utilizing the shuttle wagon;

24   is that correct?

25       A.   Yes.

1        Q.  But it was never done with utilizing the

2    capstan; is that correct?

3        A.  No.

4        Q.  Do you know why it was that written

5    standardized procedures were never done prior to

6    March 5, 2002?

7        A.  No, I don't know.

8        Q.  Are all cars today moved by shuttle

9    wagons in both the wheel true mill and the M2

10   shaft?

11       A.  Well, shuttle wagon or locomotive or by

12   other equipment not being operated by a train

13   crew.

14       Q.  Prior to March 5, 2002 was there some

15   type of plywood wind screen located near the

16   machine?

17       A.  I'm not sure if it was plywood or

18   Plexiglass.

19       Q.  Today there is a wind screen; is that

20   correct?

21       A.  Yes.

22       Q.  And today the wind screen is Plexiglass?

23       A.  Yes.

24       Q.  And you could see through the Plexiglass?

25       A.  Yes.

12

1      Q.   Is there a safety rule that requires that

2   someone at the capstan see if a fellow employee is

3   in a safe position before he moves any equipment?

4      A.   I'm not aware of it, no.

5      Q.   Are you familiar with the Rule 9176?

6      A.   No.  I would have to look it up.

7      Q.   I would guess that would be a rule that

8   would be in existence?

9      A.   Sure.

10     Q.   And you don't recall if the wind screen

11  was plywood or Plexiglass prior to the accident?

12     A.   No, I don't recall.

13     Q.   The control stand on March 5, 2002, did

14  it have a button on it to operate idler rollers?

15     A.   There was a switch position location that

16  was marked idler roller, yes.

17     Q.   Did that button work?  Was it

18  operational?

19     A.   No.  It had never been operational.

20     Q.   And is it operational today?

21     A.   Today it is, yes.

22     Q.   And was a solenoid added to the switch or

23  the button to activate the button so it works the

24  idler rollers?

25     A.   Yes.

1    Q.  Is there any reason that was not done

2    prior to March 5, 2002?

3    A.  Is there a reason?  No, I mean, outside

4    of the manual lever that existed that was used for

5    years.

6    Q.  The manual lever that existed was close

7    to the rail; is that correct?

8    A.  It was mounted below the rail on the

9    abutment that supports the machine, the wheel true

10   machine.

11   Q.  On the east side of the machine?

12   A.  What we call the north side.

13   Q.  Okay.  Is there any reason why the valve

14   could not have been mounted somewhere away from

15   the rail?

16   A.  I'm sure it could have been.  The way the

17   air lines went the original concern would be, you

18   know, tripping hazard or the routing of the piping

19   itself.

20   Q.  Okay.  Who at Metro-North made the

21   decision after the fatality to Jeff Pieger to stop

22   using the capstan?

23   A.  I gave that instruction that night.

24   Q.  Okay.  What was the reason why you gave

25   that instruction?

1      A.   The only reason I recall, we had shuttle
2   wagons.  Although, that was inappropriate I
3   believe due to the defect in one of the tires.  We
4   had to have the shuttle wagons modified for use on
5   the wheel true machine because the original tires
6   were being damaged or damaging the machine by
7   hitting the covers and some of the other
8   protective covers on top.  The employees were
9   quite comfortable with using the capstan.  It had
10  been their preferred method for years and years.
11  Attempts had been made to get them to get
12  accustomed to using shuttle wagons and get used to
13  the modern technologies that existed.  And whether
14  it's a reluctancy to change or not, I don't know.
15  But it was that night decided to take the capstan
16  out of service and just force the issue to use the
17  shuttle wagons.
18      Q.   Did you have a shuttle wagon available
19  right after Jeff Pieger's fatality?
20      A.   Not immediately right after.  We have two
21  shuttle wagons in New Haven.  One was modified for
22  the operation on the machine.  That was not
23  available due to the defect in the tire.  And we
24  had to wait until that tire was repaired, which
25  was a couple days later I believe.

1    Q.   Okay.   Where was the tire repaired?

2    A.   I believe it was Charlie's Tire, or there

3    was a local vendor that arranged to have the tire

4    fixed.   They reviewed the entire tire.

5    Q.   How long prior to March 5, 2002 was the

6    tire damaged?

7    A.   It had been noted I believe a couple of

8    weeks prior.   There was a question on, you know,

9    inquiring the proper tire.   We had gone through

10   the shuttle wagon manufacturer for the engineering

11   redesign on the tires.   The original tires were

12   foam filled.   The clearance on the wheel true

13   machine required us to go to a narrow profile tire

14   with an extension plate or something similar that

15   would move the tires out in proper alignment with

16   the rails.   Also, we couldn't have foam filled

17   because of the profile of the tires.   They were

18   pneumatic.   That's one of the reasons.   Once there

19   was a cut in the sidewall, we weren't able to use

20   the tire anymore.

21   Q.   What caused the cut in the sidewall, if

22   you know?

23   A.   I'm not sure.   It would have been just

24   damage due to getting on and off the rail with the

25   machine.   If the operator is getting on where

1  there is a low ballast, there could be a tendency

2  by the rail to cut the sidewall.  It was in the

3  inside sidewall of the tire that was defective.

4      Q.  When was the machine first brought to New

5  Haven?

6      A.  I don't remember.

7      Q.  Was it in 1998 after the Rennard injury?

8      A.  It was after the Rennard injury that

9  based on the recommendation of the committee back

10  then some type of device or some type of equipment

11  be purchased to move the equipment.  And they came

12  up with the shuttle wagon.  So, I mean, it took a

13  number of, I'm sure a great number of months, if

14  not a year or two, to purchase the machine because

15  of the cost and because of the design that they

16  wanted built into it.  It was something new for

17  shuttle wagons to adapt to our equipment, type of

18  couplers we have on our equipment.

19      Q.  Did they have a demonstration early in

20  1998 in New Haven which you attended to see how

21  the shuttle wagon operated?

22      A.  Yes.  There was a demonstration, yes.

23      Q.  And that was approximately March of 1998;

24  is that correct?

25      A.  I don't recall.

1    Q.   And was the actual machine purchased in

2  1998 or 1999?

3    A.   I don't know.

4    Q.   Okay.  Did you have the machines in

5  1999?  To put things in proper perspective for

6  you, assume that Herb Rennard was injured in

7  December of 1997.

8    A.   I would think sometime in 1999 we

9  received them.  We received three.  I was in

10  Stamford at the time.  We received the first one

11  down there.

12    Q.   Did you send one to Stamford and two

13  machines to New Haven?

14    A.   I believe as the deliveries were made the

15  first one went to New Haven.  Delivery of the

16  second, which was a few months later, went to

17  Stamford.  And then the third one went to New

18  Haven.

19    Q.   Now, between 1999 and March of 2002, how

20  often did the railroad actually use the shuttle

21  wagon in the wheel true mill?

22    A.   We didn't use it much in the beginning.

23  Again, because I said, the problem with the tire

24  on the machine and the interface of the tires on

25  the machine.  And they had to go back and

1  re-engineer the tire design and the mountings.  So

2  we stopped -- we didn't use it then until the

3  tires were modified.  And I can't remember when

4  they were modified.  I believe it was probably in

5  2001, the latter part of 2001 the tires were

6  modified.

7       Q.  All right.  So after the tires were

8  modified and were suitable for the wheel true

9  mill, how often did they actually use the shuttle

10  wagon in the wheel true mill between say the

11  latter part of 2001 and March of 2002?

12      A.  Again, their reluctance to change and

13  their comfort level with the capstan system, they

14  used it on occasion.  I would have liked them to

15  have used it.

16      Q.  Okay.

17      A.  There were some changing personnel down

18  there, and retraining of new people occurred on

19  occasion.

20      Q.  Did you have training in how to use the

21  shuttle wagon, any type of formal training for

22  that?

23      A.  Yes.

24      Q.  And prior to March of 2002 how many

25  people were qualified to operate the shuttle

1    wagon?

2        A.    That I don't remember.   When we first

3    purchased it, part of the purchase agreement was

4    to have a representative from central

5    manufacturing instruct people.   He did the initial

6    training.   We since then qualified one of our

7    foremen as a trainer for the shuttle wagon.   And

8    he went through a course with them.   And he is now

9    the on-site instructor.

10       Q.    And which foreman is that?

11       A.    Charles Barnsley.

12       Q.    Using the shuttle wagon gives the

13   possibility to have a, to insure a positive stop;

14   is that correct?

15       A.    Yes.

16       Q.    And that was one of the concerns that the

17   committee had with utilizing the capstan; is that

18   correct?

19       A.    Yes.

20       Q.    That's all I have.   Thank you.

21                 MR. COBB:   I have nothing.

22             (Deposition concluded at 10:17 p.m.)

23

24

25

# **CERTIFICATE**

I hereby certify that I am a Notary Public, in and for the State of

Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition

was by me duly sworn and thereupon testified as appears in the foregoing

deposition; that said deposition was taken by me stenographically in the

presence of counsel and reduced to print under my direction, and the

foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the

parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ____9____ day of

September, 2003

_____
NOTARY PUBLIC

My Commission Expires:
    10/2005